## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| FRIENDS OF MERRYMEETING BAY, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )    Docket no. 2:11-cv-38-GZS ) |
| NEXTERA ENERGY RESOURCES, LLC, et al., | ) ) ) |
| Defendants. | ) ) |

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Before the Court are cross-motions for summary judgment filed by Defendants NextEra Energy Resources, LLC, NextEra Energy Maine Operating Services, LLC, FPL Energy Maine Hydro LLC, and the Merimil Limited Partnership (collectively, "Defendants") and Friends of Merrymeeting Bay and Environment Maine (collectively, "Plaintiffs"). As explained herein, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion For Summary Judgment And Incorporated Memorandum Of Law (ECF No. 88) ("Defendants' Motion For Summary Judgment") and DENIES Plaintiffs' Motion For Partial Summary Judgment And Incorporated Memorandum Of Law In Support Of Motion For Partial Summary Judgment (ECF No. 94) ("Plaintiffs' Motion For Partial Summary Judgment").[1]

---

[1]  Also before the Court are Plaintiffs' Motion To Strike Defendants' Statement Of Additional Facts In Reply To Defendants' Motion For Summary Judgment (ECF No. 125) and Defendants' Opposition To Plaintiffs' Motion To Strike Defendants' Statement Of Additional Facts In Reply To Defendants' Motion For Summary Judgment (ECF No. 126).  In accordance with Local Rule 56, Defendants filed a statement of material facts with their motion for summary judgment (ECF No. 89).  Plaintiff responded with an opposing statement and a set of additional facts (ECF No. 112).  Defendants then filed a reply statement of facts and also included five additional facts (ECF No. 121).  Plaintiffs have moved to strike Defendants' five additional facts on the grounds that they are not permitted by Local Rule 56.  Plaintiffs are correct.  However, the Local Rules also specifically disallow motions to strike.  Local Rule 56(e).  Accordingly, the Court did not consider the five additional facts filed by Defendants in reaching the

The Court additionally notes that on December 26, 2012, more than five months after the conclusion of summary judgment briefing, Plaintiffs filed their Supplement To Plaintiffs' Motion For Partial Summary Judgment And To Plaintiffs' Opposition To Defendants' Motion For Summary Judgment and four additional documents (ECF Nos. 128, 129, 130 and 131) (together, "Plaintiffs' Supplement").  The Court hereby STRIKES Plaintiffs' Supplement (ECF Nos. 128, 129, 130 and 131) as belated and improperly filed. [2]

## I.    LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  An issue is "genuine" if "the

conclusions set forth in this Order.  Consideration of those five additional facts would not have altered the outcome of the motions currently before the Court.  Therefore, Plaintiffs' Motion To Strike is DENIED AS MOOT.

[2]  Plaintiffs did not request leave of the Court to file the Supplement or any additional documents.  Absent such a motion, Defendants lacked any opportunity to respond to the documents or allegations.  Even if leave had been requested, the Court would likely have denied the request since there is no apparent good cause for Plaintiffs' December 26 filing of documents received between October 17, 2012 and November 2, 2012.  (See Declaration of Charles C. Caldart (ECF No. 128-1) ¶¶3-6.)  In addition to these procedural failings, Plaintiffs did not provide the Court with any additional statements of material fact or indicate how any of the documents provided support any particular statement of material fact already filed.  See D. Me. Local Rule 7(f).  Instead, Plaintiffs state in a footnote that: "[t]he documents submitted here are all supportive of one or more of the statements of fact submitted by Plaintiffs (either independently or jointly with Defendants) as part of the summary judgment record."  (Plaintiffs' Supplement at 2 n.1.)  Where Plaintiffs do cite to a specific portion of the accompanying 100-page "Downstream Passage Effectiveness for the Passage of Atlantic Salmon Smolts at the Weston, Shawmut, and Lockwood Projects, Kennebec River, Maine" ("Draft Report"), they misconstrue the Draft Report.  Compare Plaintiffs' Supplement at 3-4 ("The [Draft Report] found that some percentage of the smolts passing downstream at the [Projects] dropped out of the water column and became stationary immediately after passing each project, thus indicating that acute turbine mortality likely occurred at each facility." (internal citations omitted)) with Draft Report at 34 (Page ID # 4853) (stating that a certain percentage of smolts were found "to be stationary downstream of the Project (likely mortality, predation or regurgitated tags)" and noting that the failure of additional smolts to reach a downstream monitoring station could be the result of five different causes, only one of which was mortality).  Ultimately, Plaintiffs also appear to ignore the statement on the first page of the Draft Report that "the design of this study was not appropriate to properly assess the whole station passage survival of smolts at or between the Weston, Shawmut or Lockwood Projects."  (See Draft Report (ECF No. 129) at 1 (Page ID #4820)).  In short, for a multitude of reasons, the Court will not consider Plaintiffs' Supplement in deciding the pending motions.

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida–Gonzalez v. Tirado–Delgado, 990 F.2d 701, 703 (1st Cir. 1993) (citing Anderson, 477 U.S. at 248) (additional citation omitted).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera–Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation.") (citations omitted). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (quoting In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993)).

The above-described "standard is not affected by the presence of cross-motions for summary judgment." Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 34 (1st Cir. 2005) (citation omitted). "[T]he court must mull each motion separately, drawing inferences against each movant in turn." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted); see also Alliance of Auto. Mfrs., 430 F.3d at 34 ("[L]ike the district court, we must scrutinize the record in the light most favorable to the summary judgment loser and draw all reasonable inferences therefrom to that party's behoof.").

## II.    FACTUAL BACKGROUND

This case arises out of the interaction between an endangered species, the Atlantic salmon, and four dams located on two rivers in Maine.  Pursuant to Local Rule 56(g), and for the purpose of determining whether summary judgment is appropriate, the parties have stipulated to facts material to the motions before the Court.[3]  At this point, the Court provides only a limited overview of the dispute, supplementing with additional facts where required later in this Order.

---

[3]  In the Joint Stipulated Facts For Summary Judgment (ECF No. 85) ("Joint Stipulated Facts" or "JSF"), the parties state:  "The Parties make these stipulated admissions solely for the purposes of these motions." Id. at 1.  The parties then cite Local Rule 56(g), which provides that, "[f]acts deemed admitted solely for purposes of summary judgment shall not be deemed admitted for purposes other than determining whether summary judgment is appropriate." Local Rule 56(g).  Despite submitting these 250 stipulations of fact for the purpose of deciding the summary judgment motions before the Court, Defendants assert in a footnote to Defendants' Opposition To Plaintiffs' Motion For Partial Summary Judgment With Incorporated Memorandum Of Law (ECF No. 106) ("Defendants' Opposition To Plaintiffs' Motion") that the statements made are not necessarily admissible nor should they be taken for the truth of the matter asserted.  (Id. at 11 n.7.)  Defendants' assertions are contrary to their submission of stipulations in accord with Local Rule 56(g) and their statements in that submission.  Further, Defendants rely upon the Joint Stipulated Facts in their own motion for summary judgment and motion in limine.  (See Defs.' Mot. For Summ. J. at 2-5, 7, 10-11, 13-14; Defs.' Mot. And Incorporated Mem. Of Law To Preclude Test. And Reports Of Pls.' Expert Witness, Jeffrey Hutchings (ECF No. 93) at 5.)  Defendants cannot simultaneously claim that the statements are not admissible and then seek summary judgment and the exclusion of expert testimony based on those very statements.  Accordingly, the Court considered and relied on the Joint Stipulated Facts for the purpose of deciding the motions before the Court.  In any event, the Court finds that the statements challenged by Defendants would be admissible as public records or reports under Federal Rule of Evidence 803(8).  (See Pls.' Reply (ECF No. 122) at 3-5.)

### A. Dams Along The Kennebec River And The Androscoggin River

The Kennebec and Androscoggin Rivers empty into the estuary of the Merrymeeting Bay, located along the coast of Maine. The Lockwood Project, the Shawmut Project and the Weston Project are three hydroelectric projects, or dams, located on the mainstem Kennebec River. The Lockwood Project is the first hydroelectric project upstream of Merrymeeting Bay on the Kennebec River. The Shawmut and Weston Projects are dams located upstream of the Lockwood Project on the Kennebec River. The Brunswick Project is the first hydroelectric project upstream of the Merrymeeting Bay on the Androscoggin River. While four dams are at issue in this case, there are other upstream dams located along these rivers.[4]

The Lockwood Project is owned by Defendant Merimil Limited Partnership, which is also the holder of the license to operate the Lockwood Project from the Federal Energy Regulatory Commission ("FERC"). The Shawmut, Weston and Brunswick Projects are owned by Defendant FPL Energy Maine Hydro LLC, which also holds the FERC licenses to operate those Projects. Defendant NextEra Energy Maine Operating Services, LLC serves as the day-to-day operator for each of the dams at issue in this case.

### B. Atlantic Salmon

Atlantic salmon are anadromous, meaning that they are born in fresh water, migrate to the ocean and return to fresh water to spawn. Adult Atlantic salmon return from the ocean to their native rivers and migrate upstream in the Kennebec and Androscoggin Rivers between May and

---

[4] For example, the Hydro Kennebec Project, the second dam upstream of Merrymeeting Bay along the Kennebec River, is not at issue in this case, but its effect on Atlantic salmon is currently being litigated before this Court in Friends of Merrymeeting Bay, et al. v. Brookfield Power US Asset Management, LLC, No. 2:11-cv-00035-GZS. In addition, the Brunswick Project is located approximately four and a half miles downstream from the Pejepscot Project, the second hydroelectric project upstream of Merrymeeting Bay on the Androscoggin River.

October.  Smolts[5] migrate downstream in the Kennebec and Androscoggin Rivers in the spring en route to the ocean.

The Maine Department of Marine Resources ("MDMR") has stocked hatchery Atlantic salmon eggs in the Sandy River, an upstream spawning habitat for Atlantic salmon on the Kennebec River, since 2003 and stocked nearly one million eggs that year.  In addition, there has been a limited Atlantic salmon fry stocking program in tributaries of the Androscoggin River upstream of the Brunswick Project.

On June 19, 2009, the National Marine Fisheries Service ("NMFS") and the United States Fish and Wildlife Service ("USFWS") (collectively, the "Services") issued a final rule including the Atlantic salmon populations of the Kennebec, Androscoggin and Penobscot Rivers as part of the Gulf of Maine Distinct Population Segment ("GOM DPS"), thereby formally designating those populations of Atlantic salmon endangered under the Endangered Species Act ("ESA").  That same day, NMFS issued a final rule designating "critical habitat" for the Kennebec, Androscoggin and Penobscot Atlantic salmon.  The portions of the Kennebec River where the Lockwood, Shawmut and Weston Projects are located, and the portion of the Androscoggin River where the Brunswick Project is located, are part of the critical habitat designated on June 19, 2009.

### C.    Downstream and Upstream Passage At The Dams

On the Kennebec River, downstream-migrating Atlantic salmon encounter the Weston, Shawmut and Lockwood Projects, in addition to an additional dam not at issue in this case.  On

---

[5]  Three to six weeks after Atlantic salmon eggs hatch, young salmon emerge from their redds, or series of nests, seeking food.  At that point, they are called "fry."  Fry quickly develop into "parr," with camouflaging vertical stripes.  The parr feed and grow for one to three years in their native streams or rivers before undergoing a series of physiological and morphological changes to become "smolts" ready to enter salt water.  Smolts migrate downstream to the ocean where they develop over one to three years into mature adult salmon before returning to fresh water to complete the spawning cycle.  Post-spawning adult salmon are called "kelts."

the Androscoggin River, Atlantic salmon encounter the Brunswick Project, in addition to other dams not at issue in this case.

Downstream-migrating salmon can pass hydroelectric projects by three basic means: through the turbines, through the fish bypass and via the spill.  Each project at issue in this case has multiple turbines of various types.  Each project also has a fish bypass.  The Lockwood and Weston Projects have guidance booms that operate in conjunction with the fish bypasses at those dams.[6]  However, those guidance booms have not always functioned properly, requiring repairs and replacements at times.  (JSF ¶¶ 200-212, 225-230.)

Upstream-migrating salmon on the Kennebec River encounter the Lockwood Project.  Near the west bank of the Kennebec at the Lockwood Project is a fish lift.  MDMR personnel trap and transport any Atlantic salmon that find the fish lift to the Sandy River, upstream of the Shawmut and Weston Projects.  In 2011, 60 adult Atlantic salmon were trapped at the Lockwood Project.  Upstream-migrating salmon in the Androscoggin River encounter the Brunswick Project, where an upstream passage system is in place.  At the Brunswick Project, fish can use a "vertical slot" fish ladder to swim to the top of the dam, where they are crowded into a hoist and lifted into a holding tank.  The fish are released into a flume upstream of the Brunswick Project.  In 2011, 45 adult Atlantic salmon were trapped at the Brunswick Project.  Some of the adult Atlantic salmon that return to the Androscoggin are likely returning to the river in which they spawned.

---

[6]  For example, the Lockwood Project has a "Tuffboom" guidance boom that includes a 10-foot deep curtain, the top ten feet of which are made of a perforated metal place and the bottom six feet are made of synthetic fiber netting.  (JSF ¶ 206.)  A guidance boom is intended to assist in guiding downstream migrating fish towards a fish bypass and away from a hydroelectric project's turbines.  (See, e.g., JSF ¶ 220.)

**D.      Friends Of Merrymeeting Bay and Environment Maine**

Friends of Merrymeeting Bay ("FOMB") is a Maine conservation organization that conducts research, advocacy, land conservation, education and litigation activities in order to preserve, protect, and improve the ecological, aesthetic, historical, recreational and commercial values of Merrymeeting Bay and its watershed on behalf of its approximately 400 members. Environment Maine is a statewide environmental advocacy group that is engaged in education, research lobbying, litigation and citizen organizing to encourage the conservation and protection of Maine's waterways on behalf of its approximately 3,500 members. FOMB and Environment Maine each have numerous members who live or own homes near the Kennebec and Androscoggin Rivers and Merrymeeting Bay, and who participate in recreational activities on or near those water bodies.

Ed Friedman and Kathleen McGee, who have been members of FOMB and Environment Maine since before this action was filed, live within sight of Merrymeeting Bay. Friedman and McGee enjoy kayaking, canoeing, fishing, hiking, photographing and observing the aquatic life and wildlife in and around the Kennebec and Androscoggin Rivers and Merrymeeting Bay. Their enjoyment and use of these waters is impaired by the reduced numbers of Atlantic salmon. Friedman is a long-time Maine guide who has conducted kayaking tours and instruction in the Merrymeeting Bay watershed since the mid-1980s. A healthy population of Atlantic salmon in Merrymeeting Bay, which does not currently exist, would positively impact Friedman's business. (Friedman Dep. (ECF No. 96-9) at 4081-82, 4097-98.)[7]

---

[7] Defendants object to Friedman's deposition on the grounds that the deposition was taken in connection with Friends of Merrymeeting Bay, et al. v. Topsham Hydro Partners Limited Partnership, No. 2:11-cv-37-GZS, a related case to the one currently before the Court. (Defendants' Response To Plaintiffs' Statement Of Undisputed Material Facts (ECF No. 107) at 14.) Defendants' objection is without merit. "Sworn deposition testimony may be used to support or oppose a motion for summary judgment regardless of whether the testimony was taken in a prior proceeding" as long as the testimony is based on personal knowledge. Dickinson v. UMass Mem'l Med. Group, No. 09-40149-FDS, 2011 WL 1155497, at *8 (D. Mass. Mar. 24, 2011). There is no dispute that Friedman testified

### E.      The Litigation

On May 10, 2011, Plaintiffs filed their Amended Complaint (ECF No. 27) asserting causes of action under the ESA (Count I) and the Clean Water Act (Count II) against Defendants.  Specifically, in Count I, Plaintiffs claim that Defendants are "taking" endangered Atlantic salmon through the operation of the four dams at issue in this case in violation of the ESA.  In Count II, Plaintiffs claim that Defendants are violating the Clean Water Act through their operations at the Lockwood, Weston and Shawmut Projects on the Kennebec River.

On May 25, 2012, Defendants moved for summary judgment on all of Plaintiffs' claims (ECF No. 88).  Defendants argue that they are entitled to summary judgment because Plaintiffs lack standing to bring this suit, Plaintiffs are unable to show an entitlement to injunctive relief and that Defendants are not violating the Clean Water Act.  On May 26, 2012, Plaintiffs moved for Partial Summary Judgment seeking a liability ruling on Counts I and II (ECF No. 94.).  In conjunction with these motions, the parties also briefed three motions in limine with regard to proffered expert testimony and a motion to strike (ECF Nos. 91, 92, 93 and 125).[8]

## III.   DISCUSSION

### A.      Standing Under The Endangered Species Act

At the threshold, Defendants argue that Plaintiffs lack standing because no relief that this Court could provide would ensure recovery of the Atlantic salmon as a species.  Accordingly, Defendants argue, Plaintiffs fail the redressability prong of the standing inquiry.

To satisfy Article III's standing requirements, "Plaintiffs must show (1) that they have suffered an injury in fact, (2) that the injury is fairly traceable to the defendant's allegedly

---

based on personal knowledge.  The Court additionally notes that the crossover use of the depositions of common witnesses was contemplated by the Court's earlier order.  (See Order on Pls. Mot. to Consolidate (ECF No. 56) at 2.)

[8]  The Court addressed the three motions in limine in its separate Order On Motions In Limine.

unlawful actions, and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Animal Welfare Inst. v. Martin, 623 F.3d 19, 25 (1st Cir. 2010) (internal quotations omitted). Moreover, because Plaintiffs' standing to bring this suit is challenged on summary judgment, Plaintiffs "can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. Rule Civ. P. 56(e), which for purposes of the summary judgment motion will be taken to be true." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

To satisfy the injury in fact requirement, Plaintiffs must show that Defendants have invaded "a legally protected interest that is 'concrete and particularized.'" Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 156 (4th Cir. 2000) (quoting Lujan, 504 U.S. at 560). Here, Plaintiffs' members aver that they live within sight of Merrymeeting Bay and that those members kayak, canoe, fish, hike and photograph in the vicinity of the Bay. Further, evidence before the Court establishes that Plaintiffs' members observe aquatic and wildlife in and around the Kennebec and Androscoggin Rivers and Merrymeeting Bay. This stated "desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." Lujan, 504 U.S. at 562-63; see also Martin, 623 F.3d at 25 (finding Plaintiffs satisfied the injury in fact requirement where Plaintiffs' affidavits revealed that "the members frequently visit wildlife refuges and parks in Maine to try to observe lynx and other wildlife species"). Plaintiffs provide that their enjoyment and use of those waters is impaired by the reduced numbers of Atlantic salmon. Mr. Friedman, a long-time Maine guide, testified that a healthy population of Atlantic salmon, which does not currently exist, would positively impact his business. (Friedman Dep. at 4081-82, 4097-98.) The Supreme Court has established "that environmental plaintiffs adequately allege injury in fact when they aver that

they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 183 (2000) (internal citations and quotations omitted). Plaintiffs have adequately shown an injury to their interests.

For purposes of summary judgment, Defendants concede that if Plaintiffs can establish that a take has occurred, Plaintiffs have satisfied the injury in fact requirement. (Defs.' Mot. For Summ. J. at 9.) This concession, however, misconstrues the injury required for standing under the ESA. Plaintiffs need not establish that the environment or the Atlantic salmon have been injured to establish an injury in fact. Instead, "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff. To insist upon the former rather than the latter as part of the standing inquiry . . . is to raise the standing hurdle higher than the necessary showing for success on the merits." <u>Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. at 181.

The second prong of the standing inquiry considers whether "the injury is fairly traceable to the defendant's allegedly unlawful actions." <u>Martin</u>, 623 F.3d at 25 (internal punctuation omitted). The purpose of the second prong is to ensure that there is a "genuine nexus between a plaintiff's injury and a defendant's alleged illegal conduct" and that plaintiffs' injury is not caused by a third party, not presently before the Court. <u>Gaston Copper Recycling Corp.</u>, 204 F.3d at 161; <u>see also</u> <u>Lujan</u>, 504 U.S. at 560. Plaintiffs need not prove to a scientific certainty that defendants' actions caused the injury. <u>Gaston Copper Recycling Corp.</u>, 204 F.3d at 161. Indeed, "[t]he 'fairly traceable' standard is not equivalent to a requirement of tort causation." <u>Id.</u> (internal quotations and citations omitted).

Here, Plaintiffs have sufficiently shown that their injury is fairly traceable to Defendants' actions. The Services have stated to the Maine Department of Marine Resources, and Defendants, that "Dams directly and substantially reduce survival rates of Atlantic salmon . . . . Dams also directly kill and injure a significant number of salmon on both upstream and downstream migrations." (JSF ¶¶ 180-81.) For purposes of standing, Plaintiffs have adduced evidence to show that dams contribute to the decreased number of Atlantic salmon present in the Kennebec and Androscoggin rivers and Merrymeeting Bay. Notably, Defendants do not seriously contest that Plaintiffs satisfy the second element of the standing inquiry, pausing only to "question" whether Plaintiffs can show traceability in a footnote. (Defs.' Mot. For Summ. J. at 9 n.10.) The Court notes, however, that the determination that Plaintiffs have shown traceability for standing purposes in this action is only an initial hurdle. Plaintiffs still maintain the burden of showing on the merits that the Defendants have actually caused a taking of Atlantic salmon in violation of the ESA.

Finally, Plaintiffs must demonstrate that it is "likely as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 561. Defendants place the most heft behind arguing that Plaintiffs have failed to show redressability on the grounds that no relief this Court could provide would ensure the recovery of Atlantic salmon. Indeed, Defendants assert that "Plaintiffs cannot establish that it is likely that the salmon will recover, even if the dams were completely removed." (Defs.' Mot. For Summ. J. at 10.) Defendants' arguments, however, cast the relief sought too broadly. It is beyond question that Plaintiffs would like to see Atlantic salmon recover as a whole species and no longer listed as an endangered species, but, through this lawsuit, Plaintiffs seek only to have their aesthetic and recreational enjoyment of Atlantic salmon increased. An injunction would redress their injury, at

least in part.  Assuming that the dams "take" Atlantic salmon, as Defendant have done with regard to standing, if the dams were to cease use of their turbines during Atlantic salmon migration (or any other number of measures Plaintiffs have suggested), it is likely that fewer Atlantic salmon would be harmed by the dams.  See Strahan v. Coxe, 939 F. Supp. 963, 979 (D. Mass. 1996) (finding redressability where the cessation of use of gillnets and lobster gear in Massachusetts waters would likely decrease the number of endangered whales harmed through entanglements), aff'd in part, rev'd on other grounds, 127 F.3d 155.

Plaintiffs need not establish that their requested relief will bring about the recovery of the Atlantic salmon.  See, e.g., Coho Salmon v. Pacific Lumber Co., 61 F. Supp. 2d 1001, 1014-15 (N.D. Cal. 1999) (rejecting the argument that Plaintiffs lacked redressability where the suggested relief was "not certain to result in the increased coho salmon population").  If a plaintiff was required to show that its requested relief would ensure recovery of the species in order to have standing under the ESA, courts would be powerless to consider any measure that would attempt to halt the extinction of a species.  That is not what Congress intended.  See Tennessee Valley Auth. v. Hill, 437 U.S. 153, 184 (1978) ("The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost.")

Defendants similarly argue that Plaintiffs lack standing because they have not shown what the impact of their suggested relief will be on the whole station survival rate of Atlantic salmon passing the dams.  (Defs.' Mot. For Summ. J. at 10.)  In other words, Defendants argue that Plaintiffs cannot show how well any of their suggested relief "will work."  (Id. at 11.) Again, an injunction could redress Plaintiffs' injuries by decreasing the number of salmon that are likely injured and killed by the dams.  In a Clean Water Act case, the Third Circuit similarly stated that "[p]laintiffs need not show that the waterway will be returned to pristine condition in

13

order to satisfy the minimal requirements of Article III."  Pub. Interest Research Grp. of N.J. v. Powell Dufferyn Terminals, Inc., 913 F.2d 64, 73 (3rd Cir. 1990).  Likewise here, Plaintiffs do not have to show that their suggested remedies will ensure the recovery of the species.  In conclusion, Plaintiffs have sufficiently established standing at this stage of the litigation.[9]

**B.       Count I:  Alleged Violations Of The Endangered Species Act**

Plaintiffs seek a liability ruling with respect to Count I of their Amended Complaint (ECF No. 27) regarding alleged violations of the ESA.  FOMB and Environment Maine contend that Defendants' Lockwood, Shawmut and Weston Hydroelectric Projects on the Kennebec River and Defendants' Brunswick Hydroelectric Project on the Androscoggin River are engaging in unauthorized takings of Atlantic salmon in violation of the ESA.

Congress has declared that the purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).  Accordingly, when it was passed, the ESA represented "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  Tennessee Valley Auth., 437 U.S. at 180.  Under the ESA, "[v]irtually all dealings with endangered species, including taking, possession, transportation, and sale, were prohibited, except in extremely narrow circumstances."  Id. (internal citations omitted).  To further the protection afforded by the ESA, the statute includes a citizen suit provision, allowing interested

---

[9]  Although not addressed or challenged by Defendants, an association such as FOMB or Environment Maine has "standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. at 181.  Here, FOMB's purpose is to preserve, protect, and improve the ecological, aesthetic, historical, recreational and commercial values of Merrymeeting Bay.  Environment Maine's purpose is to encourage the conservation and protection of Maine's waterways.  The interests invoked in this litigation in observing Atlantic salmon free from takings at the dams are germane to these purposes.  Neither the claims asserted nor the requested relief would require participation from any individual member of FOMB or Environment Maine.  Accordingly, FOMB and Environment Maine have standing to bring this suit.

persons to bring suit to force compliance with the ESA.  Id. at 180-81; see also 16 U.S.C. § 1540(g).

Section 9 of the ESA makes it unlawful for any person to "take" any threatened or endangered species of fish or wildlife within the United States, unless an incidental take statement or incidental take permit is obtained pursuant to Section 7 or Section 10 of the ESA, respectively.  16 U.S.C. §§ 1536, 1539.  "Take" is defined to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  Id. § 1532(19).  The definition of "take" was intended to "apply broadly to cover indirect as well as purposeful actions."  Babbit v. Sweet Home Chapter Of Cmtys. For A Greater Or., 515 U.S. 687, 704 (1995).  The Secretary of the Interior has defined "harm" in the definition of "take" to mean: "an act which actually kills or injures wildlife.  Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3; see also Babbit, 515 U.S. at 708 (upholding the Secretary's definition of harm to include "significant habitat modification or degradation that actually kills or injures wildlife").

### 1.    The Standard For Establishing A Taking

In the First Circuit, "[t]he proper standard for establishing a taking under the ESA, far from being a numerical probability of harm, has been unequivocally defined as a showing of 'actual harm.'"  American Bald Eagle v. Bhatti, 9 F.3d 163, 165 (1st Cir. 1993).  In Bhatti, Plaintiffs challenged a deer hunt on the Quabbin Reservation in Eastern Massachusetts on the ground that it posed a significant risk to the bald eagles at the Quabbin Reservation in violation of the ESA.  Id. at 164.  In that case, Plaintiffs presented an attenuated casual chain lacking any proof whereby bald eagles could be injured if some of the deer shot by hunters with lead slugs

were not recovered but died in the feeding area of the bald eagles; those unrecovered deer would then contain lead in their bodies; bald eagles could then feed on those deer, ingest some of the lead and be harmed by the lead.  Id. at 164.  Plaintiffs failed to show that any of the bald eagles actually ingested lead or ate deer containing lead.  Id. at 166.  The First Circuit declined to find a taking, stating that "there must be actual injury to the listed species" to find harm.  Id.  Further, "courts have granted injunctive relief only where petitioners have shown that the alleged activity has actually harmed the species or if continued will actually, as opposed to potentially, cause harm to the species."  Id.  In elucidating the standard, the First Circuit noted that a showing of a "significant risk of harm" was a lower degree of certainty than that required to establish a taking.  Id. at 166 n.5.[10]

To establish a taking on summary judgment, Plaintiffs need to show that there is no genuine dispute that Atlantic salmon have been actually harmed.  Evidence of a single, actual injury to an Atlantic salmon will suffice to show a taking under the ESA.  Strahan v. Coxe, 127 F.3d 155, 165 (1st Cir. 1997) (providing that "a single injury to one whale is a taking under the ESA").

### 2.     The Presence Of Atlantic Salmon

Before turning to evidence of taking of Atlantic salmon in this case, the Court pauses to note that there must be Atlantic salmon in the vicinity of the dams before a taking can occur.  See, e.g., Beech Ridge Energy LLC, 675 F. Supp. 2d at 567-576 (examining potential caves in which the endangered Indiana bat could hibernate, the physical characteristics of the planned

---

[10]   The standard established by the First Circuit to show a taking under the ESA differs substantially from the standard established in other courts.  For example, in Animal Welfare Inst. v. Beech Ridge Energy, LLC, the district court looked to the Ninth Circuit in finding that to establish a taking under the ESA, a plaintiff "must establish, by a preponderance of the evidence, that the challenged activity is reasonably certain to imminently harm, kill, or wound the listed species." 675 F. Supp. 2d 540, 563 (D. Md. 2009) ("Beech Ridge") (referencing Marbled Murrelet v. Pacific Lumber Co., 83 F.3d 1060 (9th Cir. 1996)).

project site, mist-net surveys and acoustic data to determine that the endangered Indiana bat was present at the challenged project site). Plaintiffs have shown that a limited number of Atlantic salmon are in the vicinity of the dams at issue in this case. Atlantic salmon eggs are stocked annually in the Sandy River, an upstream spawning habitat for Atlantic salmon on the Kennebec River. (JSF ¶¶ 64-65.) Atlantic salmon fry also are stocked in the upstream tributaries of the Androscoggin River. (Id. ¶ 69.) The Court logically concludes that at least some of those Atlantic salmon make it downstream to the dams at issue in this case. Moreover, Atlantic salmon have been trapped at the lower most dams on each of the Kennebec and Androscoggin Rivers and then either trucked or lifted upstream. In 2011, 60 adult Atlantic salmon were trapped at the Lockwood Project on the Kennebec River. (Id. ¶ 81.) That same year, 45 adult Atlantic salmon were trapped at the Brunswick Project on the Androscoggin River. (Id. ¶ 86.) Accordingly, Atlantic salmon are in the vicinity of these dams.

### 3. Evidence Of Taking Atlantic Salmon In This Case

The evidence presented on summary judgment shows that there is a genuine issue of material fact as to whether the Defendants are taking Atlantic salmon at the dams. Defendants do not have an incidental take statement or an incidental take permit for any of the Projects that would exempt from ESA liability any taking of Atlantic salmon at the Projects. See 16 U.S.C. §§ 1536(o)(2), 1539. (See also JSF ¶ 34.) However, Defendants are, and have been for a number of years, engaged in the process of applying for an incidental take statement or an incidental take permit to cover the operation of the dams. (Id. ¶¶ 35-36.) As part of the application process, Defendants and their hired consultants have developed draft "White Papers" that contain estimated survival rates for Atlantic salmon that pass through the dams at issue in

this case.[11]  The White Papers are intended by Defendants to be scientifically defensible.  (Id. ¶ 43.)

The White Papers use two methods of estimating injury and mortality for Atlantic salmon smolts that may pass through the Projects.  First, the "empirical turbine mortality method" used "mark-recapture" studies done at dams not at issue in this case with turbines and operational characteristics that Defendants deemed similar to the Projects at issue in this case.  (Id. ¶¶ 126-27.)  No mark-recapture studies of Atlantic salmon have been conducted at any of the four Projects at issue in this case (Id. ¶ 127.)  For the mark-recapture studies that were completed at other dams, test salmon were tagged above a hydroelectric project, released into a downstream route, collected after passing through the dam, held and then physically examined for signs of injury or mortality.  (Id. ¶ 128.)  The test salmon were evaluated one hour after passage to evaluate immediate mortality or injury and then 48 hours after passage to evaluate delayed mortality.  (Id. ¶ 129.)

The results of those mark-recapture studies conducted at dams not at issue in this case reveal that any salmon that may pass through the Projects via the turbines have a statistical chance of being injured or killed.  For example, based on studies done at other dams, it is estimated that 85.1% of any downstream migrating smolts that pass through the Francis turbines at the Lockwood Project, which are six of the seven turbines at that Project, survive after one hour and 76.2% are uninjured after one hour.  (Id. ¶¶ 92, 132, 133.)  At the Brunswick Project,

---

[11] More specifically, as part of the application process, Defendants and the Services convened a group comprised of personnel from the Services, the MDMR and non-governmental environmental groups.  (JSF ¶ 37.)  That group reviewed documents submitted by Defendants as part of the process of applying for an incidental take statement or incidental take permit and provided feedback.  Defendants submitted a preliminary draft Habitat Conservation Plan ("HCP") to that group as part of the application process.  (Id. ¶ 39.)  To inform the HCP, Defendants and their hired consulting firms prepared a series of draft papers known as "White Papers" to provide an assessment of estimated "whole station survival" under certain assumptions at each of the four projects.  (Id. ¶¶ 40, 42.)  The White Papers derived predicted whole station survival at each project by estimating the percentages of downstream migrating salmon that may pass through each project via the turbines, the fish bypass and the spill and then predicting the number of salmon that may be injured or killed through such passage.  (Id. ¶ 42.)

which has three propeller turbines, it is estimated that 94.7% of any downstream migrating smolts that pass through the propeller turbines survive after one hour, 92.8% survive after 48 hours and 92.5% are uninjured after one hour.[12]  (Id. ¶¶ 116, 138, 139.)  The mark-recapture studies also estimate that any Atlantic salmon that may pass through the dams via bypass or spillway have a chance of being injured or killed.  For example, based on studies conducted at other dams, it is estimated that 81.6% of any downstream migrating smolts that pass via the bypass or spillway are not injured or killed by the passage.[13]  (Id. ¶¶ 159, 161.)

Second, the "Advanced Hydro Turbine model" was used to estimate potential turbine mortality for Atlantic salmon smolts that may pass through the Projects.  The Advanced Hydro Turbine model calculates the statistical probability of a turbine blade strike on a fish that passes through a turbine based on certain operation characteristics at the Projects and the anticipated body lengths of smolts and kelts in the Kennebec and Androscoggin Rivers.  (JSF ¶¶ 140, 141.)  The results of the Advanced Hydro Turbine model show that smolts and the larger kelts that pass through the dams via the turbines have a statistical chance of being injured or killed.[14]

---

[12]  The mark-recapture studies contain the following additional results:  Based on studies done at other hydroelectric projects, it is estimated that 94.7% of any downstream migrating smolts that pass through the Kaplan turbine at the Lockwood Project survive after one hour, 92.8% survive after 48 hours and 92.5% are uninjured after one hour.  (Id. ¶¶ 132, 133.)  At the Shawmut Project, it is estimated that 85.1% of any downstream migrating smolts that pass through the Francis turbines, which are six of the eight turbines at the Shawmut Project, survive after one hour and 76.2% are uninjured after one hour.  (Id. ¶¶ 100, 134, 135.)  It is further estimated that 94.7% of any downstream migrating smolts that pass through the propeller turbines at the Shawmut Project survive after one hour, 92.8% survive after 48 hours and 92.5% are uninjured after one hour.  (Id. ¶¶ 134, 135.)  At the Weston Project, which has four Francis turbines, it is estimated that 91.5% of any downstream migrating smolts that pass through the Francis turbines survive after one hour, 91.3% survive after 48 hours and 93.8% are uninjured after one hour.  (Id. ¶¶ 108, 136, 137.)

[13]  The full results of the mark-recapture studies for smolts and kelts passing via a bypass or spillway include the following additional results:  For each of the four projects at issue in this case, based on studies performed at other hydroelectric projects, it is estimated that 97.1% of any downstream migrating smolts or kelts that pass via the bypass or the spillway survive after one hour and 96.3% survive after 48 hours.  (JSF ¶¶ 158, 160.)  No statistics were provided for overall injury or death to kelts by passage through a bypass or spillway.

[14]  The full results of the Advanced Hydro Turbine model are as follows:  For smolts at the Lockwood Project, it is estimated that approximately 82.0% of any downstream migrating smolts that pass through the Francis turbines would survive and 91.6% of any downstream migrating smolts that pass through the Kaplan turbine would survive.  (JSF ¶ 144.)  For kelts at the Lockwood Project, it is estimated that approximately 72.1% of any downstream

Combining the results of the mark-recapture studies done at dams not at issue in this case and the statistical probabilities developed in the Advanced Hydro Turbine model with historic river flow data, the White Papers contain estimates of whole station survival rates for smolts and kelts that pass through the Projects.[15]  Overall, the White Papers estimate that between 90% and 95% of any downstream migrating smolts will survive passage over or through the dams, between 82% and 93% of any downstream migrating smolts will remain uninjured from such passage, and, that between 73% and 89% of any downstream migrating kelts will be uninjured after passing through or over the dams.[16]  Even after altering the calculations to take into account different percentages of Atlantic salmon using different downstream passage routes and flow

---

migrating kelts that pass through the Kaplan turbine would survive.  (Id. ¶ 150.)  No estimates were provided for any kelts that may pass through the Francis turbines.  For smolts at the Shawmut Project, it is estimated that approximately 84.7% of any downstream migrating smolts that pass through the Francis turbines would survive and 94.3% of any downstream migrating smolts that pass through the propeller turbines would survive.  (Id. ¶ 145.)  For kelts at the Shawmut Project, it is estimated that approximately 81.1% of any downstream migrating kelts that pass through the propeller turbines survive.  (Id. ¶ 151.)  No estimates were provided for any kelts that may pass through the Francis turbines.  For smolts at the Weston Project, it is estimated that approximately 88.2% of any downstream migrating smolts that pass through the Francis turbines would survive.  (Id. ¶ 146.)  For kelts at the Weston Project, it is estimated that approximately 59.6% of any downstream migrating kelts that pass through the Francis turbines would survive.  (Id. ¶ 152.)  For smolts at the Brunswick Project, it is estimated that approximately 92.7% of any downstream migrating smolts that pass through the propeller turbines would survive.  (Id. ¶ 147.)  For kelts at the Brunswick Project, it is estimated that approximately 75.9% of any downstream migrating kelts that pass through the propeller turbines would survive.  (Id. ¶ 153.)

[15]  Whole station survival is calculated based on the total number of salmon expected to survive passage through the turbines, through the bypass and via spill during "normally anticipated conditions" at each project.  (JSF ¶ 162.)  To evaluate potential mortality via bypass and spillway, the results of mark-recapture studies done at dams not at issue in this case were considered.  (Id. ¶ 155.)

[16]  The full predictions of the White Papers are as follows:  For the Lockwood Project, the primary estimates predict that between 92% and 94% of any downstream migrating smolts and 88% of any downstream migrating kelts will survive passage through or over the Project and that 85% will be uninjured as a result of such passage.  (JSF ¶¶ 166, 170.)  For the Shawmut Project, the primary estimates predict that between 90% and 91% of any smolts migrating downstream and 89% of any kelts migrating downstream will survive passage over or through the Project and that 82% of any smolts will be uninjured as a result of such passage.  (Id. ¶¶ 167, 170.)  For the Weston Project, the primary estimates predict that between 90% and 93% of any smolts migrating downstream and 73% of any kelts migrating downstream will survive passage over or through the Project and that 83% of any smolts will be uninjured as a result of such passage.  (Id. ¶¶ 168, 170.)  For the Brunswick Project, the primary estimates predict that between 93% and 95% of any smolts migrating downstream and 85% of any kelts migrating downstream will survive passage over or through the Project and that 91% of any smolts will be uninjured as a result of such passage.  (Id. ¶¶ 169, 170.)

levels in the rivers, under no conditions was a whole station survival estimate of 100% predicted at any of the projects.  (JSF ¶¶ 171-75.)

Plaintiffs urge that these statistics establish that Defendants are engaged in taking Atlantic salmon at all four of the Projects at issue in this case.  However, viewing the record in the light most favorable to Defendants, in this case the Court finds that statistics alone cannot establish an absence of genuine issues of material fact or that Plaintiffs are entitled to judgment as a matter of law.  The statistics presented are either based on studies done at dams not at issue in this case or are calculations of numerical probabilities of harm that may befall Atlantic salmon.  Neither is sufficient to establish ESA liability on summary judgment.  Instead, there is a genuine issue of material fact as to whether there has been actual harm to Atlantic salmon at these four dams.  To establish a taking, the First Circuit requires more than a "numerical probability of harm" or even a "significant risk of harm."  Bhatti, 9 F.3d at 165, 166 n.5.  Actual harm is required.  Id. at 165.  The Court recognizes that the evidence put forward by Plaintiffs in this case is a far cry from the "one in a million" chance of harm and attenuated causal chain that was insufficient to establish a taking in American Bald Eagle v. Bhatti.  Id. at 165-66.  Nonetheless, Plaintiffs must show that Atlantic salmon have been actually harmed before summary judgment will be granted in their favor.  The statistics put forward by Plaintiffs show that there is a chance that any Atlantic salmon that pass through the dams may be injured or killed by such passage.  A chance of harm does not establish a taking in the First Circuit.

In addition to the statistics, Plaintiffs point to statements made by the Services in an August 2009 letter and in the final administrative decision to include the Kennebec River and Androscoggin River populations of Atlantic salmon on the Endangered Species List.  (JSF ¶¶ 179, 180-81.)  Those documents contain statements that implicate dams generally as a threat to

Atlantic salmon.  The documents do not contain statements to implicate the dams at issue in this case with any type of specificity.  For example, the final administrative decision stated:  "Dams are known to typically injure or kill between 10 and 30 percent of all fish entrained at turbines," and "Dams are among the leading causes of both historical declines and contemporary low abundance of the GOMS DPS of Atlantic salmon."  (Id. ¶ 179.)  The August 2009 letter stated: "Dams directly and substantially reduce survival rates of Atlantic salmon in the following ways" and then described in general terms the effects of dams on Atlantic salmon.  (Id. ¶ 181.)  These generalized statements that implicate dams in the plight of the Atlantic salmon are not sufficient alone, or with the studies discussed previously, to affirmatively establish liability on summary judgment.[17]

Plaintiffs point to Animal Welfare Institute v. Beech Ridge Energy LLC, 675 F. Supp. 2d 540 (D. Md. 2009), in support of their argument that the evidence presented in this case – circumstantial probabilities and general statements implicating dams – is sufficient to establish that a taking has occurred at the dams.  (Pls.' Mot. For Partial Summ. J. at 15-16.)  In Beech Ridge, the district court did indeed find it "a virtual certainty" that endangered Indiana bats would be harmed or injured by the challenged wind turbine project despite that no dead or injured bat had yet been found.  Id. at 578-79.  The court made that finding, however, with the benefit of a four-day trial that included the testimony of at least three credible expert witnesses and numerous studies and research, at least some of which were conducted at the challenged site.

---

[17]  Lastly, Plaintiffs argue that Defendants are engaged in taking Atlantic salmon by blocking upstream passage on the Kennebec River.  As Plaintiffs acknowledge, Defendants, in conjunction with the State of Maine, have a system for trapping Atlantic salmon at the Lockwood Project, the first upstream dam on the Kennebec, and transporting them to spawning grounds on the Kennebec River that are upstream of the Shawmut and Weston Projects.  Plaintiffs then state, in a footnote: "The trap and truck system is lawful only because Maine has been issued a permit authorizing this take."  (Pls.' Mot. For Partial Summ. J. at 17 n.27.)  Without citation to any relevant legal authority, Plaintiffs argue that the Court should find a taking in violation of the ESA despite the lawful permit.  In addition, Plaintiffs' general statements regarding the harm caused by obstructed fish passage are insufficient to establish liability for a taking.  To the extent Plaintiffs seek summary judgment on this basis, it is DENIED.

See id. at 545-559, 564-567.  Further, the district court in Beech Ridge applied a lower degree of certainty, "that the challenged activity is reasonably certain to imminently harm, kill, or wound the listed species," than that required by the First Circuit.  Id. at 563.   While the district court found that the plaintiffs would have established a taking under the more onerous First Circuit standard, the court also said "[b]ecause the risk of harm was highly speculative in [Bhatti], the First Circuit's observations regarding the degree of certainty of harm required by the ESA were not necessary to the decision."  Id. at 563.  This Court does not cast the First Circuit's guidance aside so lightly, particularly in the context of summary judgment.

In short, based on the evidence presented at this stage of the proceedings, there is a genuine issue of material fact as to whether the Defendants are engaged in taking Atlantic salmon by operation of the four dams at issue in this case.  Accordingly, Plaintiffs' Motion For Partial Summary Judgment as to Count I is DENIED.

### C.    Count I:  The Availability Of Injunctive Relief

Next, Defendants contend they are entitled to summary judgment on Count I because Plaintiffs cannot establish an entitlement to injunctive relief on their ESA claim.  Defendants claim that injunctive relief is permitted for an ESA claim only where a plaintiff can establish that the takings are causing harm to the endangered species.

The First Circuit has rejected a per se rule regarding availability of injunctive relief in ESA cases, instead favoring a fact-sensitive analysis.  Not every taking requires injunctive relief and the death of a single animal may present a situation where injunctive relief is appropriate.  See, e.g., Water Keeper Alliance  v. U.S. Dept. of Defense, 271 F.3d 21, 34 (1st Cir. 2001) (finding that "vague concerns as to long-term damage to the endangered species" were insufficient to establish irreparable harm); Animal Welfare Inst. v. Martin, 588 F. Supp. 2d 70,

106 (D. Me. 2008).  Whether irreparable harm has been presented by a case requires an inquiry into the facts and circumstances of the case that takes into account the harm to wildlife and the effect of that harm on the species.

In Animal Welfare Institute v. Martin, 623 F.3d 19 (1st Cir. 2010), plaintiffs appealed the denial of their motion to enjoin Maine state officials from allowing the use of traps, including the foothold trap and the Conibear trap, arguing that the injunction was necessary to protect the Canada lynx, a threatened species.  Id. at 21.  As to the foothold trap, the court denied preliminary injunctive relief, rejecting plaintiffs' argument that an injunction must issue as a matter of law upon finding an incidental taking even in the absence of irreparable harm.  Id. at 23.  In contrast, the court granted preliminary injunctive relief as to the Conibear trap, finding irreparable harm in the death of a single lynx that had been killed in a Conibear trap in November 2008.  Id.  "Even though [plaintiffs] had not established that the death of one threatens the species as a whole, it had demonstrated that the current regulations are inadequate and it is predictable that if the regulations are not amended, other lynx will suffer irreparable harm."  Id. (internal quotations and citations omitted).  After a six-day hearing on the effects of both traps, the district court denied permanent injunctive relief and found that it was not likely that lynx would be taken in Conibear traps in light of the new regulations issued by the state of Maine pursuant to the preliminary injunction.  Id. at 24.  As to the foothold traps, the district court found that even if Canada lynx suffered injuries as a result of being trapped in the foothold traps, plaintiffs had not shown that those injuries threatened the species.  Id. at 24-25.  The district court denied injunctive relief.  Id. at 25.

On appeal, the First Circuit endorsed the fact intensive analysis engaged in by the district court in determining when an injunction should issue.  The First Circuit highlighted the different

conclusions reached by the district court – to issue a preliminary injunction as to Conibear traps but not as to foothold traps – in stating that "[t]he district court thus engaged in exactly the fact-sensitive analysis required by law."  Id. at 27.  Therefore, in the First Circuit, "the death of a single animal may call for an injunction in some circumstances, while in others the death of one member is an isolated event that would not call for judicial action because it has only a negligible impact on the species as a whole."  Id. at 29.  Further, "the degree to which there is irreparable injury is a factor to be balanced against the other injunction criteria."  Animal Welfare Institute, 588 F. Supp. 2d at 106.  In short, Defendants here misapprehend the law in claiming that Plaintiffs must necessarily reach the high bar of showing harm to Atlantic salmon as a species before the Court may issue any injunctive relief.

For purposes of their injunctive relief argument, Defendants concede that even if the dams at issue in this case are engaged in taking Atlantic salmon, Plaintiffs are not entitled to injunctive relief.  (Defs.' Mot. For Summ. J. at 11-12.)  Accordingly, assuming for purposes of Defendants' Motion that the dams are engaged in taking Atlantic salmon, Plaintiffs have presented the expert witness testimony of Dr. Jeffrey A. Hutchings that these presumed takings are negatively impacting Atlantic salmon on a species-wide level.[18]  Indeed, Dr. Hutchings repeatedly stated that "[t]he mortality experienced by downstream migrating smolts and kelts and by upstream migrating returning adults attributable to dam facilities in the Merrymeeting Bay [Salmon Habitat Recovery Unit] will have an adverse impact on the survival and the prospects for recovery of the [Salmon Habitat Recovery Unit] and, thus, of the GOM DPS as a whole." (Opinion of Dr. Jeffrey A. Hutchings (ECF No. 79-6) at 1564; see also id. at 1574-76, 1577;

---

[18]  The Court addressed Defendants' Motion And Incorporated Memorandum Of Law To Preclude Testimony And Reports Of Plaintiffs' Expert, Jeffrey Hutchings (ECF No. 93) in its Order On Motions In Limine.

Hutchings Dep., Vol. II (ECF No. 81-2) at 2503-2505.)  Accordingly, to the extent Defendants request summary judgment on that basis, it is DENIED.

> ### D.       Count II:  Alleged Violations Of The Clean Water Act

Both Plaintiffs and Defendants move for summary judgment on Count II of Plaintiffs' Amended Complaint.  Count II claims that Defendants are violating the water quality certificates for the Lockwood, Weston and Shawmut Projects on the Kennebec River in violation of the Clean Water Act.

The objective of the Clean Water Act ("CWA") is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  Accordingly, under the CWA, hydroelectric dams must obtain a state "water quality certification" before they may obtain a license to operate from FERC.  33 U.S.C. § 1341.  The water quality certification then becomes a condition of the FERC license.  Id. §1341(d).

The water quality certifications for the Lockwood, Weston and Shawmut Projects on the Kennebec River each contain the following provision:

> INTERIM DOWNSTREAM FISH PASSAGE:  The applicant shall continue and where needed improve existing operational measures to diminish entrainment, allow downstream fish passage, and eliminate significant injury to out-migrating anadromous fish in accordance with the terms of the KHDG [Kennebec Hydro Developers Group] Settlement Agreement.

(JSF ¶ 195.)  The KHDG Settlement Agreement, in turn, provides:

> In the event that adult shad and/or adult Atlantic salmon begin to inhabit the impoundment above the . . . project, and to the extent that licensee desires to achieve interim downstream passage of out-migrating Atlantic salmon and/or adult shad by means of passage through the turbine(s), licensee must first demonstrate through site-specific quantitative studies designed and conducted in consultation with the resource agencies, that passage through turbine(s) will not result in significant injury and/or mortality (immediate or delayed).  In no event

shall licensee be required to make this quantitative demonstration for adult shad and adult Atlantic salmon before May 1, 2006.

(JSF ¶ 196.)

From the arguments presented, Defendants do not contest that adult Salmon and shad inhabit the impoundments above the Kennebec River dams or that the requisite site-specific quantitative studies have not been performed to show that turbine passage will not result in injury and/or mortality to the fish.   Instead, both Plaintiffs and Defendants urge different meanings of the following phrase in the Agreement:   "To the extent licensee *desires* to achieve interim downstream passage of out-migrating Atlantic salmon and/or adult shad by means of passage through the turbine(s) . . . ."   (JSF ¶ 196, emphasis added.)

Although Plaintiffs paint this clause as ambiguous and needing of the Court's interpretation, the relevant portion -- "to the extent licensee desires" -- is not ambiguous.   See Waltman & Co. v. Leavitt, 722 A.2d 862, 864 (Me. 1999) ("When a contract is reasonably subject to two or more interpretations, or its meaning is unclear, it is ambiguous.")   It is what the licensee, the Defendants, desire – or want – that triggers the remainder of the clause's requirements.   The reasonable interpretation of this clause carries a subjective component.   See, e.g., American Heritage Dictionary 491 (5th ed. 2011) (defining "desire" as "[t]o wish or long for; want: *a reporter who desires an interview; a teen who desires to travel*").   Plaintiffs challenge that subjective intent is not relevant and that Defendants could simply shut the turbines down during migration and thereby avoid the need to conduct the studies.   This interpretation, however, ignores the plain language of the Agreement and reads the relevant words out of the Agreement.   Because the clause is in the Agreement, the Court will give it effect.   See OfficeMax v. Levesque, 658 F.3d 94, 99 (1st Cir. 2011) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which

leaves a part unreasonable, unlawful, or of no effect." (quoting Restatement (Second) of Contracts § 203(a))).

Alternatively, Plaintiffs attempt to substitute "knowledge" for "desire." That is, Plaintiffs argue that because Defendants know that some Atlantic salmon and/or shad may be passing through the turbines, Defendants desire to have the fish pass through the turbines. Had the parties to the Agreement intended Defendants' knowledge of Atlantic salmon or shad passing through the turbines to trigger the requisite studies, the parties could have so stated.

The evidence before the Court on summary judgment reveals that Defendants do not desire to pass Atlantic salmon and/or shad through the turbines. Instead, the Defendants' desire is that the fish bypass the turbines. Two of the three dams have floating booms to aid in bypassing the turbines. (JSF ¶¶ 220, 225, 234.) Robert Charles Richter, III, testifying for Defendants, stated that the Defendants had not completed the studies referenced in the Agreement because Defendants' "desire is not to pass [the fish] through the turbines." (Richter Dep. (ECF No. 82-4) at 3124.) Plaintiffs present evidence that Atlantic salmon and/or shad are in fact passing through the turbines and Defendants have not taken sufficient steps to prevent that passage. Even assuming the truth of the evidence, it is not germane to the Court's inquiry. Knowledge does not equate to desire. Accordingly, Defendants have demonstrated an absence of evidence to support the CWA claim and Plaintiffs have failed to raise a genuine issue of material fact. Therefore, Defendants are entitled to summary judgment on Count II.

## V.      CONCLUSION

For the reasons explained herein, Defendants' Motion For Summary Judgment (ECF No. 88) is DENIED as to Count I but GRANTED as to Count II. Plaintiffs' Motion For Partial Summary Judgment (ECF No. 94) is DENIED. Also, Plaintiffs' Motion To Strike Defendants'

Statement Of Additional Facts In Reply To Defendants' Motion For Summary Judgment (ECF No. 125) is DENIED AS MOOT.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 14th day of January, 2013.