## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| FRIENDS OF MERRYMEETING BAY, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Docket no. 2:11-cv-38-GZS |
| NEXTERA ENERGY RESOURCES, LLC, et al., | ) ) ) | |
| Defendant. | ) ) | |

## ORDER ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Before the Court is Plaintiffs' Motion For A Preliminary Injunction And Incorporated Memorandum Of Law ("Motion For Preliminary Injunction").  As explained herein, the Court DENIES Plaintiffs' Motion For Preliminary Injunction (ECF No. 148).[1]

## I.   LEGAL STANDARD FOR PRELIMINARY INJUNCTION

Plaintiffs, as the moving party, bear the burden of persuasion to show:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Iantosca v. Step Plan Servs., Inc., 604 F.3d 24, 29 n.5 (1st Cir. 2010) (citation omitted).  In considering all of these factors, the Court remains mindful that a preliminary injunction is "an extraordinary remedy never awarded as of right."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  Rather, a district judge should exercise the authority to issue a preliminary

---

[1]  Because neither Plaintiffs nor Defendants requested an evidentiary hearing on this matter, the Court has decided the pending motion on the papers.  Plaintiffs, who filed the pending Motion, explicitly stated that: "Plaintiffs do not believe that an evidentiary hearing is necessary and are requesting that this matter be decided on the submissions filed."  (Pls.' Letter In Resp. To Order & Report Of Conference (ECF No. 160) at 1.)  Defendants did not object to the pending Motion being decided on the submissions filed.  (See Correspondence Regarding Evidentiary Hr'g (ECF No. 162) at 1.)

injunction "sparingly." Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness of Com. of Mass., 649 F.2d 71, 76 n.7 (1st Cir. 1981). Generally, likelihood of success on the merits is considered the "most important part of the preliminary injunction assessment." Jean v. Mass. State Police, 492 F.3d 24, 27 (1st Cir. 2007). However, a court may also consider injunctive relief based on a very significant showing of irreparable harm. See Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 895 (7th Cir. 2001) (explaining that the preliminary injunction "process involves engaging in . . . the sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position"). Any such showing of irreparable harm must be "grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." Charlesbank Equity Fund II v. Blinds to Go, 370 F.3d 151, 162 (1st Cir. 2004).

## II.   BACKGROUND

This case arises out of the interaction between an endangered species, the Atlantic salmon, and four dams (collectively, the "Projects") located on two rivers in Maine, the Kennebec and Androscoggin Rivers. Atlantic salmon are born in fresh water, migrate to the ocean and return to fresh water to spawn. Adult Atlantic salmon return from the ocean to their native rivers and migrate upstream in the Kennebec and Androscoggin Rivers between May and October. Smolts[2] migrate downstream in the Kennebec and Androscoggin Rivers in the spring

---

[2]   Three to six weeks after Atlantic salmon eggs hatch, young salmon emerge from their redds, or series of nests, seeking food. At that point, they are called "fry." Fry quickly develop into "parr," with camouflaging vertical stripes. The parr feed and grow for one to three years in their native streams or rivers before undergoing a series of physiological and morphological changes to become "smolts" ready to enter salt water. Smolts migrate downstream to the ocean where they develop over one to three years into mature adult salmon before returning to fresh water to complete the spawning cycle. Post-spawning adult salmon are called "kelts."

en route to the ocean.  In June of 2009, the Atlantic salmon populations of these two rivers were designated as endangered under the Endangered Species Act, 16 U.S.C. §§ 1531-44 ("ESA").

On the Kennebec and Androscoggin Rivers, downstream migrating smolts encounter several hydroelectric projects.  The Lockwood Project, the Shawmut Project and the Weston Project are three dams located on the mainstem Kennebec River.  The Brunswick Project is the first hydroelectric project upstream of the Merrymeeting Bay on the Androscoggin River. Defendant Merimil Limited Partnership owns these four Projects and holds the Federal Energy Regulatory Commission ("FERC") License to operate each of these dams.[3]  (See Assented To Mot. To Substitute Brookfield Renewable Services Maine, LLC, As A Def. (ECF No. 157) at 1-2.)

While four dams are at issue in this case, there are other upstream dams located along these rivers.  Specifically, the Hydro Kennebec hydroelectric dam (the "Hydro Kennebec Dam") is located on the Kennebec River, and the Pejepscot hydroelectric dam (the "Pejepscot Dam") and Worumbo hydroelectric dam (the "Worumbo Dam") are located on the Androscoggin Rivers.  The effects of those dams on Atlantic salmon were litigated before this Court in related cases.  Each of those three dams received an incidental take statement ("ITS") pursuant to Section 7 of the Endangered Species Act within the last year, authorizing a specific level of Atlantic salmon takings at each dam and exempting those takings from liability under the ESA. (See Friends Of Merrymeeting Bay v. Brookfield Power US Asset Mgmt., LLC, No. 1:11-cv-35, Order On Renewed Motion To Dismiss (ECF No. 143) at 6-7 (stating that the Hydro Kennebec

---

[3]  On March 1, 2013, now-terminated Defendants NextEra Energy Resources, LLC and NextEra Energy Maine Operating Services, LLC transferred their interest in Defendants FPL Energy Maine Hydro LLC, and Merimil Limited Partnership to Brookfield Renewable Services Maine, LLC.  (See Assented To Mot. To Substitute Brookfield Renewable Services Maine, LLC, As A Def. (ECF No. 157) at 1-2.)  Accordingly, Defendants in this case are now Merimil Limited Partnership, FPL Energy Maine Hydro, LLC and Brookfield Renewable Services Maine, LLC (collectively, "Defendants").  (See id.)

Dam received its ITS on September 17, 2012); <u>Friends Of Merrymeeting Bay v. Miller Hydro Group</u>, No. 2:11-cv-36, Order On Renewed Motion To Dismiss (ECF No. 110) at 6 (stating that the Worumbo Dam received its ITS on October 18, 2012); <u>Friends Of Merrymeeting Bay v. Topsham Hydro Partners Limited P'ship</u>, No. 2:11-cv-37 (ECF No. 112) at 6 (stating that the Pejepscot Dam received its ITS on September 19, 2012).)

Defendants do not have incidental take authority that would exempt any taking of Atlantic salmon at the Projects from ESA liability.  <u>See</u> 16 U.S.C. §§ 1536(o)(2), 1539. However, for a number of years, Defendants had been in the process of applying for an incidental take permit under ESA Section 10 to cover the operation of the dams.  On January 11, 2013, prior to the Court's issuance of the Order On Cross Motions For Summary Judgment (ECF No. 132) ("Order On Summary Judgment"), Defendants notified the National Marine Fisheries Service ("NMFS") that they had decided to pursue incidental take authorization under Section 7 for an interim period spanning 2013-2019, rather than incidental take authorization under Section 10.  (Decl. Of Kevin Bernier In Supp. Of Defs.' Opp'n To Mot. For Prelim. Inj. (ECF No. 158-1) ("Bernier Decl.") ¶ 2.)   On February 12, 2013, Defendants provided NMFS with a draft biological assessment ("BA") and interim species protection plan ("ISPP"), and on February 21, 2013, Defendants submitted the draft BA and ISPP to FERC.  (Id. ¶ 7, 12.)  The issuance of an ITS that will cover the Projects is expected by the end of July, 2013.

Detailed in the draft BA and ISPP are smolt studies to be conducted at the Projects during the spring 2013 migration season.  (Bernier Decl. ¶ 11; Feb. 20, 2013 Ltr. from Chad P. Clark, Vice President FPL Energy Maine Hydro LLC to Jeff Murphy, NOAA's National Marine Fisheries Service (ECF No. 158-11) at 1-2.)  The studies call for six paired releases of hatchery-raised smolts at each of the Projects "with releases frequent enough to ensure that the entire

spring 2013 migration period is represented."  (Bernier Decl. ¶ 14.)  Releases of radio-tagged fish will begin at the most upstream Kennebec River dam, the Weston Project, at the outset of the migration period when the water temperature around the projects reaches approximately 10 degrees Celsius, which may be as early as late April or as late as early May.  (Id.)  Subsequent releases will occur at the next downstream dams in sequence and are expected to involve a 2-3 day period for each trial.  An identical study protocol will be used at the Brunswick Project on the Kennebec River.  (Id.)  The stated purpose of the studies is to "evaluate Project survival for Atlantic salmon smolts at the Lockwood, Shawmut and Weston Projects. . . . This information will be valuable in evaluating whether potential passage delays or mortalities may be occurring and directing efforts to improve passage through the Projects."  (Atlantic Salmon Passage Study Plan For the FPL Energy Maine Hydro Kennebec River Hydro Projects (ECF No. 158-20) ("Study Plan") at PageID # 8136.)  Jeff Murphy of NMFS stated that "NMFS certainly supports conducting smolt studies at the [P]rojects this spring.  The proposed studies are consistent with the ISPP that we recently reviewed and will be filed with FERC."  (Feb. 20, 2013 E-mail from Jeff Murphy to Robert Richter (ECF No. 158-20) at 1.)

### III.    PROCEDURAL BACKGROUND

Plaintiffs initiated this case on January 1, 2011.  (Complaint (ECF No. 1).)  On May 10, 2011, Plaintiffs filed their Amended Complaint (ECF No. 27) asserting causes of action under the ESA (Count I) and the Clean Water Act (Count II) against Defendants.  On May 25 and 26, 2012, Defendants and Plaintiffs moved for full and partial summary judgment, respectively. (ECF Nos. 88 & 94.)  At no time during the first two and a half years of this case did Plaintiffs request a preliminary injunction to protect Atlantic salmon smolts during the spring or fall migration seasons.

Nonetheless, via the pending Motion For Preliminary Injunction, Plaintiffs request that the Court enter the following order:

> Defendants shall halt the operations of all turbines at their Weston, Shawmut, and Lockwood hydroelectric projects on the Kennebec River, and their Brunswick project on the Androscoggin River, during the entirety of the downstream migration season of Atlantic salmon smolts this spring (from April 15 through June 5); provided that Defendants may apply to the Court for permission to operate specific turbines at specific projects for only those limited periods of time necessary for the collection of turbine mortality data as required by the National Marine Fisheries Services ("NMFS") and must, during any such periods of time, increase flow to bypass and spill gates to the maximum levels described in NextEra's 2012 smolt passage study.

(Motion For Preliminary Injunction at 1.)

Plaintiffs filed this first request for preliminary injunctive relief on March 14, 2013, more than two years after filing their initial Complaint. The Court notes that Plaintiffs first informed the Court of their intent to seek a preliminary injunction on February 22, 2013. (See Joint Status Report (ECF No. 135) at 1.) This information was provided pursuant to the Court's January 14, 2013 Procedural Order, which directed the parties to indicate whether they were prepared to proceed to trial in light of the Court's rulings on the cross motions for summary judgment. Because Plaintiffs at no time requested expedited briefing on the March 14, 2013 Motion for Preliminary Injunction, the briefing has followed the Court's standard schedule resulting in the motion being taken under advisement on April 12, 2013.

## IV.    DISCUSSION

### A.    Likelihood Of Success On The Merits

Count I of Plaintiffs' Amended Complaint (ECF No. 27) asserts that Defendants engage in illegal "takes" of Atlantic salmon via operation of the Projects in violation of the ESA. Thus, the Court begins its inquiry on the Motion For Preliminary Injunction by examining whether Plaintiffs are likely to succeed on the merits of their claim. See Esso Standard Oil Co. (Puerto

6

Rico) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006) (stating that "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits").

Section 9 of the ESA makes it unlawful for any person to "take" any threatened or endangered species of fish or wildlife within the United States, unless an incidental take authority is obtained pursuant to Section 7 or Section 10 of the ESA.  16 U.S.C. §§ 1536, 1539. "Take" is defined to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  Id. § 1532(19).  The definition of "take" was intended to "apply broadly to cover indirect as well as purposeful actions."  Babbit v. Sweet Home Chapter Of Cmtys. For A Greater Or., 515 U.S. 687, 704 (1995).  The Secretary of the Interior has defined "harm" in the definition of "take" to mean:  "an act which actually kills or injures wildlife.  Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3; see also Babbit, 515 U.S. at 708.

In the First Circuit, "[t]he proper standard for establishing a taking under the ESA, far from being a numerical probability of harm, has been unequivocally defined as a showing of 'actual harm.'"  American Bald Eagle v. Bhatti, 9 F.3d 163, 165 (1st Cir. 1993).  In Bhatti, the First Circuit declined to find a taking where Plaintiffs challenged a deer hunt on the Quabbin Reservation in Eastern Massachusetts on the ground that it posed a significant risk to the bald eagles at the Quabbin Reservation in violation of the ESA.  Id. at 164.  The First Circuit stated that, "courts have granted injunctive relief only where petitioners have shown that the alleged activity has actually harmed the species or if continued will actually, as opposed to potentially, cause harm to the species."  Id.  In elucidating the standard, the First Circuit noted that a showing

7

of a "significant risk of harm" was a lower degree of certainty than that required to establish a taking. Id. at 166 n.5.

In the Order On Summary Judgment, the Court explored Plaintiffs' evidence of alleged takings at the Projects and found that evidence insufficient to establish ESA liability on summary judgment.  (See Order On Summary Judgment at 23.)  Instead, the evidence on summary judgment showed trial-worthy issues on whether there had been a taking at any of the dams at issue and if so, the impact of that taking on the species.  The Court now finds that the evidence presented on summary judgment is also insufficient to satisfy Plaintiffs' burden here.  In short, on the record presented on summary judgment, Plaintiffs have not demonstrated a clear showing of entitlement to relief.  See Winter, 555 U.S. at 22.  Moreover, despite the Court's instruction to focus the Motion For Preliminary Injunction on newly discovered or recently developed evidence (Order On Pls.' Mot. For Leave To File Prelim. Inj. Brief In Excess Of Twenty Pages (ECF No. 147) at 1), Plaintiffs' Motion largely regurgitates evidence previously discussed by the Court.  For example, Plaintiffs again point to the final administrative decision to include the Kennebec and Androscoggin River populations of Atlantic salmon on the Endangered Species List.  (Motion For Preliminary Injunction at 18-19.)  The Court finds that the statements contained in that document, which implicate dams generally as a threat to Atlantic salmon, do not establish a likelihood of success on the merits.  Plaintiffs also point to statements made by various members of federal and state agencies regarding studies done at the three dams to show a likelihood of success on the merits.  (Id. at 19-21.)  Those statements either are outdated or are taken out of context.[4]  Thus, the Court finds that the evidence previously submitted on summary

_____

[4]  For example, Plaintiffs point to a statement made by Jeff Murphy wherein he stated:

This study in conjunction with previous studies at the Lockwood and Hydro-Kennebec Project demonstrates that partial-depth floating flow booms are not consistently effective in preventing

8

judgment and resubmitted on this Motion insufficient to show the requisite likelihood of success on the merits.

Plaintiffs present three categories of "new" evidence.[5]   First, Plaintiffs proffer the February 21, 2013 draft BA.  Plaintiffs point to the BA and "White Papers"[6] for the Projects to show that Atlantic salmon are injured and killed at each of the dams.  (Motion For Preliminary Injunction at 7-9.)  Contrary to Plaintiffs' assertion, the BA does not establish mortality or injury of Atlantic salmon but instead states:

> Site-specific injury (initial; 1-hr) and mortality (initial; 1-hr and delayed; 48-hr) rates for Atlantic salmon smolts passed via turbine units were not available for the Weston, Shawmut, Lockwood or Brunswick projects.  As a result, estimates for passage survival of Atlantic salmon smolts through Francis, Kaplan and propeller units were developed based on existing empirical studies conducted at other hydroelectric projects with similar characteristics.

(Draft BA for Atlantic Salmon at the Lockwood, Shawmut, Weston, Brunswick and Lewiston Falls Hydropower Projects on the Kennebec and Androscoggin Rivers, Maine (ECF No. 149-4)

---

Atlantic salmon smolts from turbine entrainment. . . . This extremely low survival is certain to preclude recovery of the Merrymeeting Bay Salmon Habitat Recovery Unit.  To effectively protect endangered Atlantic salmon smolts and kelts at the Weston and Lockwood Projects, we recommend that NextEra implement complete turbine shutdowns in the spring and fall to protect listed Atlantic salmon smolts and kelts or installation of state-of-the-art fish passage facilities.

(Oct. 26, 2012 E-mail from Jeff Murphy to Robert Richter (ECF No. 149-25) at PageID # 6699.)  Plaintiffs cited only that there was "extremely low survival" without also indicating that the assessment was based on previous studies that included a dam not at issue in this case.  Plaintiffs notably omit the second sentence of the e-mail which acknowledged that the study was not appropriate to assess mortality at the Projects and requested further explanation.

[5]  As "new" evidence, Plaintiffs additionally point to the deposition of Wendy Bley, the development coordinator and lead negotiator for Defendants' Habitat Conservation Plan, a component of the application for incidental take authority.  (See March 14, 2012 Dep. of Wendy Bley (ECF No. 149-1) at 13-14.)  The Court notes that this deposition was taken in March of 2012, prior to the filing of Plaintiffs' Motion For Partial Summary Judgment on May 26, 2012 (ECF No. 94).  Nonetheless, the Court considered the testimony cited by Plaintiffs.  That testimony discussed the estimates included in the Habitat Conservation Plan, which the Court previously considered and found insufficient on summary judgment.

[6]  Plaintiffs presented and the Court thoroughly explored the evidence contained in the White Papers on summary judgment.  (See Order On Summary Judgment at 17-21.)  In summary, the Court found that the White Papers, and the statistics contained therein, are "either based on studies done at dams not at issue in this case or are calculations of numerical probabilities of harm that may befall Atlantic salmon.  Neither is sufficient to establish ESA liability on summary judgment."  (Id. at 21.)  The White Papers were incorporated into the BA.  Despite its inclusion on the record on summary judgment, the Court considered the evidence contained within the BA on this Motion.

at PageID # 5485.)  The Court has previously discussed the difficulties of establishing a taking under the First Circuit standard based on calculations of numerical probabilities of harm.  (See Order On Summary Judgment at 21.)

Second, Plaintiffs point to a 2012 passage study of the Lockwood, Shawmut and Weston projects.  As on summary judgment, Plaintiffs appear to ignore the plain statement in the report that "the design of this study was not appropriate to properly assess the whole station passage survival of smolts at or between the Weston, Shawmut or Lockwood Projects."  (Downstream Passage Effectiveness for the Passage of Atlantic Salmon Smolts at the Weston, Shawmut and Lockwood Projects, Kennebec River, Maine (ECF No. 149-20) ("Downstream Study") at PageID # 6480; see also Order On Summary Judgment at 2 n.2.)  Plaintiffs' expert, Randy Bailey, agreed with the assessment that the study was not appropriate to evaluate whole station survival.  (Corrected Decl. of Randy Bailey (ECF No. 153) ("Bailey Decl.") ¶ 89.)  Nonetheless, Plaintiffs state that "of the 120 smolts released above Weston, 111 passed Weston, but only 34 were confirmed to have survived passaged to a point 1.75 miles below Lockwood."  (Motion For Preliminary Injunction at 17.)  Plaintiffs then cite an unrelated biological opinion for the proposition that those fish that did not reach the most downstream marker were killed (id. at 17-18) and ignore the study's own assessment of the multiple potential reasons for the loss of smolts:

> The loss of smolts originally released upstream of the Weston Project may be the result of (1) immediate mortality associated with passage at the Weston, Shawmut, Hydro-Kennebec or Lockwood Projects, (2) delayed mortality from passage at the Weston, Shawmut, Hydro-Kennebec or Lockwood Projects, (3) transmitter regurgitation, (4) failure of transmitter power supply, (5) low flow conditions in the more impounded portions of the river, (6) loss of migratory drive due to release during the latter part of the outmigration season, or (7) predation.

(Downstream Study at PageID # 6509.)   Regardless, the Court notes that for one of seven potential reasons, only two of which are mortality at the Projects, a certain percentage of Atlantic salmon smolts fail to survive passage of the numerous dams on their migration.

Finally, the Court is left with the expert reports provided by the parties.  The experts disagree regarding the volume of Atlantic salmon smolts that experience turbine mortality and the impact of turbine mortality on the recovery of Atlantic salmon as a species.  (See, e.g., Decl. of Dr. Jeffrey A. Hutchings In Supp. Of Pls.' Mot. For Prelim. Inj. (ECF No. 148-4) ("Hutchings Decl.") ¶ 33; Decl. Of Brendon Kulik In Supp. Of Defs.' Opp'n To Mot. For Prelim. Inj. (ECF No. 158-22) ("Kulik Decl.") ¶ 7.)  However, the experts do not appear to disagree that some amount of turbine mortality is occurring at each of Projects.  (See Bailey Decl. ¶ 16 ("[E]ach of these projects will kill and injure (wound) emigrating Atlantic salmon smolts during their 2013 emigration season."); Hutchings Decl. ¶ 26 ("In 2013 . . . the four dams on the Kennebec River are predicted to kill 6,199 smolts under current operating conditions" ); Kulik Decl. ¶ 7 ("[W]hole-station mortality is estimated to be far less (5-10%) [than Plaintiffs' estimates at the Projects], because an estimated 75-80% of smolts pass downstream via spill, and avoid contact with turbines.").)  Therefore, while the impact of the loss of Atlantic salmon smolts is disputed among the experts, it is not disputed that some loss is occurring at the Projects.

The First Circuit maintains a high standard to establish an illegal taking in violation of the ESA.  See Bhatti, 9 F.3d at 165.  On this Motion For Preliminary Injunction, there is a consensus among the experts that some number of Atlantic salmon smolts will be harmed by passage via the turbines at the Projects during the spring 2013 migration.  Therefore, the Court necessarily finds that Plaintiffs have shown a likelihood of success on establishing a taking.  The Court notes that this finding is based on the apparent agreement of the experts and is made for

purposes of this Motion only.  Given the high standard in the First Circuit, the Court finds that while Plaintiffs' likelihood of success is not overwhelming, it is enough for the Court to consider the other factors.

## B.    Irreparable Harm

That the Court has found a measure of likelihood of success on the merits does not end the inquiry.  In seeking injunctive relief, Plaintiffs must "demonstrate that irreparable injury is likely in the absence of an injunction."  Winter, 555 U.S. at 22.  In finding that a plaintiff must show that irreparable harm is likely, the Supreme Court rejected the Ninth Circuit's "possibility" standard as too lenient.  Id.  Further, under the First Circuit's irreparable harm standard, whether irreparable harm has been presented by a case requires an inquiry into the facts and circumstances of the case that takes into account the harm to wildlife and the effect of that harm on the species.  Animal Welfare Institute v. Martin, 623 F.3d 19, 29 (1st Cir. 2010).  Accordingly, not every taking requires injunctive relief.  See, e.g., Water Keeper Alliance  v. U.S. Dept. of Defense, 271 F.3d 21, 34 (1st Cir. 2001) (finding that "vague concerns as to long-term damage to the endangered species" were insufficient to establish irreparable harm); Animal Welfare Inst. v. Martin, 588 F. Supp. 2d 70, 106 (D. Me. 2008).

### 1.    Expert Reports

Unlike with regard to whether there is Atlantic salmon mortality at the Projects, there is no consensus among the experts as to the impact of that mortality upon either this spring 2013 Atlantic salmon migration or upon the species as a whole.  First, the experts dispute the number of smolts that are being harmed.  Plaintiffs assert that "the evidence clearly shows that it is 'predictable' that endangered Atlantic salmon smolts will be killed and injured this spring at both a high rate and in large absolute numbers if the . . . [P]rojects are allowed to maintain their

normal operating regiments during the upcoming smolt migration season." (Motion For Preliminary Injunction at 24.)  Plaintiffs' expert, Dr. Hutchings, estimates that 19,762 smolts will migrate downstream on the Kennebec River during the spring 2013 migration and that 964 smolts will migrate on the Androscoggin River.[7]  (Id. ¶¶ 16-23, Table 2.)  Dr. Hutchings then uses the mortality estimates for each of the Projects allegedly provided by Defendants to estimate the number of smolts that will be killed at the Projects.  (Id. ¶ 20.)

Dr. Hutchings estimates that if the dams on the Kennebec River, including the Hydro Kennebec Dam that is not part of this lawsuit, are permitted to operate their turbines, 6,199 smolts or approximately 31% of all migrating smolts will be killed.  (Id. ¶¶ 26-27, Table 3.) Conversely, if the three dams that are subject to this lawsuit are ordered to cease turbine operations, 3,508 smolts will be killed or approximately 18% of all smolts will be killed.  (Id.) Accordingly, 2,691 fewer migrating smolts will be killed, which is a decrease from 31% to 18% of all migrating smolts killed on the Kennebec River.  On Androscoggin River, under current operating conditions, Dr. Hutchings estimates that 143 smolts will be killed or approximately 15% of all migrating smolts will be killed.  (Id.)  If the Brunswick Project is ordered to cease its turbine operations, 114 smolts or 12% of migrating smolts will be killed.  This is a reduction of 29 fewer smolt deaths.

Defendants' expert, Brandon Kulik, disputes both the premises and conclusions of Dr. Hutchings.  Kulik asserts that "whole-station mortality is estimated to be far less (5-10%) [than asserted by Plaintiffs], because an estimated 75-80% of smolts pass downstream via spill, and avoid contact with the turbines."  (Kulik Decl. ¶ 7.)  Therefore, Defendants assert that fewer

---

[7]  To arrive at his estimations, Dr. Hutchings, calculates the number of smolts that are expected to migrate this spring, the number of those smolts that will be killed if the Projects on the two rivers maintain normal operations, and finally the number of smolts that will be killed if the Projects shutdown their turbine operations.  (Hutchings Decl. ¶¶ 16-27.)

smolts will be harmed or killed during the spring 2013 migration.  Even assuming the truth of Plaintiffs' estimates and calculations, the Court notes that shutting the turbines will not halt all injury or death to Atlantic salmon smolts during this spring 2013 migration season.  Instead, under the conditions proposed by Plaintiffs, 18% of all smolts migrating on the Kennebec River will still be harmed.  Ceasing turbine operations of the Brunswick Project on the Androscoggin River will save 29 smolts, a mere 1% of all smolts Plaintiffs expected to migrate this Spring.

Second, the experts dispute the impact of turbine mortality on Atlantic salmon as a species.  Defendants' expert states that ceasing turbine operations at the Projects will not materially affect the Kennebec and Androscoggin populations of endangered Atlantic salmon because "[t]urbine mortality has a small influence on the overall adult return rate."  (Kulik Decl. ¶ 5.)  Instead, marine survival conditions, outside the influence of Defendants or the Projects, drive species recovery.  (Id.)  In support, Kulik examined the number of adult Atlantic salmon that have returned to Gulf of Maine watersheds in Maine and New Brunswick, which included rivers with and without dams.  Kulik noted that the number of adults that returned in 2011 uniformly experienced a three-fold increase from the prior year and in 2012 fell among all rivers throughout the Gulf of Maine, which is evidence that "factors that influence the return of adult fish are both universal and external to all rivers in the Gulf of Maine, and are independent of whether or not the population encounters turbines."  (Id. ¶ 12.)  Even Plaintiffs' expert, Dr. Hutchings, has stated that small swings in marine survival of Atlantic salmon smolts can have a decisive impact on the number of returning adults.  (Mar. 19, 2012 Dep. of Jeffrey A. Hutchings, Ph.D. (ECF No. 81-1) 158:7-23.)  Indeed, not even 100% survival of all smolts at all dams will result in a sufficient number of returning adults to achieve recovery of the species under current marine mortality conditions.  (Id.)  In contrast, Plaintiffs claim that "[b]ecause turbines are both

the largest source of smolt mortality at the [P]rojects and the only source that can be simply and quickly eliminated (i.e. by shutting them off)," the Court can minimize takings of Atlantic salmon smolts by imposing the preliminary injunction.  Thus, Plaintiffs do not dispute that other factors outside of the control of Defendants and the Projects have a significant impact on the fate of the Atlantic salmon species, but rather argue that, even so, the turbines at the Projects should be shuttered because it is one of the only immediate actions that can be taken to improve smolt mortality.

Third, the experts dispute whether this class – the spring 2013 Atlantic salmon smolt migration – is distinctively important.  Plaintiffs maintain that "the 2013 smolt run stands out as the most important in decades" because "an unusually high amount of genetic diversity will be represented in its wild-origin smolts."  (Hutchings Decl. ¶¶ 33, 31.)  In contrast, Defendants state that "[t]he 2013 smolt year-class is not uniquely critical to Atlantic salmon recovery" and that "the 2013 year class of smolts is comprised mostly of hatchery-fertilized, naturally-reared-salmon."  (Kulik Decl. ¶ 15.)  Kulik explains Plaintiffs' mischaracterization by showing that Plaintiffs have "employed insupportably high estimates of egg to smolt survival and number of eggs available from spawning females," that Plaintiffs calculations are grounded upon an incorrect statement that smolts run two years after hatching when it is actually two years after spawning, that the scientific literature available contradicts the premises of Plaintiffs' calculations, and that the number of "wild spawned" salmon is lower than claimed by Plaintiffs.  (Id. ¶¶ 15-17, 20.)  Accordingly, there is a genuine dispute among the experts as to the importance of this class of smolts.

Considering the expert evidence before the Court on this Motion, Plaintiffs have not shown that irreparable harm will befall Atlantic salmon in the absence of a preliminary

injunction.  Instead, the contradictory expert reports show genuine dispute over the number of Atlantic salmon harmed or killed, the effects of those injuries on the species, and the importance of this migration to the species.  Where it is Plaintiffs' burden to show irreparable harm, these genuine disputes do not establish that harm is likely, as opposed to a mere possibility.  See Winter, 555 U.S. at 22.  Further, Plaintiffs' assertion that this class is the "most important in decades" is further belied by their own conduct in this case.

### 2.       Plaintiffs' Delay

Plaintiffs have been aware of the plight of Atlantic salmon for more than two years, and yet have never in the course of this case sought a temporary restraining order or preliminary injunction.  Plaintiffs filed their initial Complaint on January 31, 2011 and asserted "the dire condition of these Atlantic salmon populations and the risk that the fish will soon become extinct" and that "Defendants' dams are a leading cause of the near extinction" of the species.  (Complaint ¶¶ 51, 46.)  Despite these claims and with over two months before the beginning of the 2011 spring migration season, Plaintiffs did not seek a temporary restraining order or a preliminary injunction at the outset of this case.  Plaintiffs repeated these warnings throughout the spring of 2011.   (Pls.' Opp. To Defs.' Mot. To Dismiss Or Stay This Action And Incorporated Mem. Of Law dated April 19, 2011 (ECF No. 21) at 2 (stating that "the Atlantic salmon population of the Kennebec and Androscoggin Rivers are near extinction . . . and that immediate measures are needed to protect the remaining salmon from the effects of these dams.").)  Still, Plaintiffs did not pursue immediate action to protect the Atlantic salmon.

After jointly moving to extend the discovery schedule in the fall of 2011 (ECF No. 43), discovery concluded on March 28, 2012.  Plaintiffs did not seek a temporary restraining order or

preliminary injunction for the spring 2012 migration season of Atlantic salmon smolts.  Instead, Plaintiffs filed a motion for partial summary judgment on May 26, 2012 (ECF No. 94).

Although Plaintiffs indicated in February 2013 that they intended to file a motion for a preliminary injunction, it was not until March 14, 2013 that the Motion was actually filed. Notably, Plaintiffs requested that the preliminary injunction take effect on April 15, 2013, and yet Plaintiffs never requested that the briefing on the Motion be expedited.  Instead, the briefing for this Motion followed the usual course.  In the Motion, Plaintiffs assert that this is the most important smolt run in decades because of the genetic variability of spawners that returned to the Kennebec and Androscoggin Rivers in 2009, 2010 and 2011.  With foresight and planning, it appears that Plaintiffs could have predicted the alleged importance of this migration and filed this Motion before the eve of the smolt run.

Plaintiffs' failure to pursue a temporary restraining order or preliminary injunction prior to this point in this case and their leisurely pursuit of this Motion undermines their claims of importance, dire circumstances and irreparable harm.  Plaintiffs offer no explanation for their protracted delay in pursuing this Motion.  As the First Circuit has stated, a party's "cries of urgency are sharply undercut by its own rather leisurely approach to the question of preliminary injunctive relief." Charlesbank Equity Fund II, 370 F.3d at 163 (affirming denial of preliminary injunction where plaintiff waited more than a year after commencing the action to seek an injunction).  A plaintiff undermines its claim of irreparable harm where there is delay between instituting the action and seeking injunctive relief.  "The longer the delay, the more pervasive the doubt." Id.

Over two years have passed since Plaintiffs initiated this lawsuit and nearly seven weeks have passed between the Court's denial of the partial motion for summary judgment and the

filing of the Motion.  Where an alleged crisis – the spring 2013 salmon run – is predictable, Plaintiffs' delay belies any claim of irreparable harm.  In Quince Orchard Valley Citizens Assoc., Inc. v. Hodel, plaintiff Association wanted to stop the construction of a road through a state park.  872 F.2d 75, 75 (4th Cir. 1989).  However, the Association waited until six months after all necessary approvals for the project had been granted before seeking a preliminary injunction.  Id.  In affirming the denial of the preliminary injunction, the Fourth Circuit stated, "[s]ince an application for preliminary injunction is based upon an urgent need for protection of a Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required."  Id. at 80 (internal citations and quotations omitted); see also Fund For Animals v. Frizzell, 530 F.2d 982, 987 (D.C. Cir. 1976) (affirming denial of preliminary injunction where plaintiffs waited 44 days after knowing the relevant facts regarding hunting regulations to bring the motion).[8] Similarly here, Plaintiffs' actions in this case undermine their claim of irreparable harm.

In short, Plaintiffs have failed to meet their burden to establish that irreparable harm is likely in the absence of injunctive relief.  The conflicting expert reports combined with Plaintiffs' leisurely pursuit of a preliminary injunction fall short of the requisite showing.

## C.      Balance Of The Harms And The Public Interest

The third and fourth factors require the Court to balance the relevant impositions and the public interest.  Initially, the Court notes that the ESA mandates that the protected species, the Atlantic salmon, "be afforded the highest of priorities."  Tennessee Valley Auth. v. Hill, 437 U.S. 153, 174 (1978).  Moreover, while in ESA cases "the balance of hardships and the public

---

[8]  Likewise, in the trademark context, where a plaintiff shows a "high probability of confusion" between its product and the infringing product, a presumption of irreparable harm arises when seeking injunctive relief.  Tough Traveler, Ltd. v. Outbound Products, 60 F.3d 964, 967-68 (2nd Cir. 1995).  However, when a plaintiff delays in either bringing suit or requesting preliminary injunctive relief, if the delay is not explainable by plaintiff's ignorance of the infringing product or good faith efforts to investigate the infringement, "delay alone may justify denial of a preliminary injunction."  Id. at 968.

interest tips heavily in favor of protected species," <u>Strahan v. Coxe</u>, 127 F.3d 155, 171 (1st Cir. 1997), in this case, the Court finds that the hardships to the public and Defendants of the proposed preliminary injunction weigh against the grant of that injunction.

### 1. Spring 2013 Smolt Studies

Ceasing turbine operations at the Projects would halt NMFS approved spring 2013 smolt studies, the cessation of which would harm Defendants, the public and Atlantic salmon. The purpose of the studies is to "evaluate Project survival for Atlantic salmon smolts at the Lockwood, Shawmut and Weston Projects." (Study Plan at PageID # 8136.) The information gathered from the studies will be used to evaluate "whether potential passage delays or mortalities may be occurring" and will further direct "efforts to improve passage through the Projects." (<u>Id.</u>) The Court finds that the studies will be beneficial to all parties. Defendants will benefit from increased information regarding downstream passage of Atlantic salmon smolts, and that information will allow Defendants to increase the protection of Atlantic salmon in the future.

In order to assess the potential effects of each of the Projects on smolt passage survival during the migration period, the study necessarily entails the operation of the turbines throughout the entire period. (Bernier Decl. ¶ 14; <u>see also</u> Study Plan at PageID # 8136 ("The assessment of smolt passage and whole station survival at these projects will be conducted throughout the spring 2013 smolt migration season to ensure that the studies reflect actual Kennebec River conditions[.]"); <u>id.</u> at PageID # 8137 ("Releases of radio-tagged smolts will occur in up to six separate groups (trials) at each dam, with releases frequent enough to ensure that the entire spring 2013 migration period is represented.") The Court does not credit Plaintiffs' assertion

that these studies can be conducted in conjunction with turbine shutdowns. [9]   In addition, the Court is reticent to step in and interfere with studies that will likely benefit the Atlantic salmon population, particularly where those studies are supported by NMFS.   In this case, the public interest, the interests of the Plaintiffs and Defendants are served by allowing Defendants to operate the Projects in the normal course.

**2.      Incidental Take Authority For Other Dams On These Rivers**

The Kennebec and Androscoggin Rivers are home to more dams than the Projects at issue in this case.   Specifically, the Hydro Kennebec Dam is located on the Kennebec River, between the Lockwood and Shawmut Dams.   The Pejepscot and Worumbo Dams are located upstream of the Brunswick dam on the Androscoggin River.   Each of those three dams received an incidental take statement pursuant to Section 7 of the ESA within the last year.   (See, e.g., Friends Of Merrymeeting Bay v. Brookfield Power US Asset Mgmt., LLC, No. 11-35, Order On Renewed Motions To Dismiss (ECF No. 143) at 6-7 (stating that the Hydro Kennebec Dam received its ITS on September 17, 2012).)   Each ITS authorizes a specific level of Atlantic salmon takings at the respective dam and exempts those taking from liability under the ESA. Even if the Court were to grant Plaintiffs' Motion, those three dams would continue normal operations.

The Court is permitted to take into account each ITS previously issued to the other dams on these rivers in its consideration of the current Motion.   See, e.g., Animal Welfare Institute v. Martin, 588 F. Supp. 2d 70, 106-07, 109-110 (D. Me. 2008) (taking an incidental take permit

---

[9]   Although Plaintiffs claim that "there will be significant periods during the April-June migration season when test fish will not be passing a Project," Plaintiffs fail to provide any evidentiary support for that assertion.  (Reply Mem. In Supp. Of Pls.' Mot. For a Prelim. Inj. (ECF No. 161) at 4.)  Instead, Plaintiffs point to the study schedule, which indicates that in April and May, Defendants will "[d]eploy and test telemetry stations for downstream study" and in May "[c]onduct field trials for downstream passage survival at all projects (Weston, Shawmut, Lockwood)."  (Study Plan at PageID # 8145.)  Plaintiffs do not explain the other statements in the study, cited above in the Court's description of the studies, nor explain how there will be significant periods of time during which fish will not be passing by one of the Projects.

application into account when evaluating the relevant impositions and public interest). In each of the related cases, the NMFS, the agency that initially listed the Androscoggin and Kennebec River populations of Atlantic salmon as endangered and then evaluated each incidental take application, found "based on a review of the best available scientific and commercial information" that the operations of each dam "may adversely affect but is not likely to jeopardize the continued existence of the GOM DPS of Atlantic salmon." (See, e.g., Friends Of Merrymeeting Bay v. Brookfield Power US Asset Mgmt., LLC, No. 11-35, Order On Renewed Motions To Dismiss (ECF No. 143) at 6.) The Court finds the grant of incidental take authority by NMFS to the other dams indicative of the impact that the Projects have on the Androscoggin and Kennebec River Atlantic salmon populations.

Further, Defendants are in the process of applying for similar incidental take authorization for the Projects. Indeed, Defendants expect an ITS for the four dams at issue in this case by the end of July of this year. While that ITS will not cover this spring 2013 migration season, the likely grant of the ITS in short order further counsels against imposition of the "extraordinary remedy" of a preliminary injunction. As this Court previously stated in Animal Welfare Institute:

> The Court is reluctant to impose an ukase on trapping in the state of Maine based on dueling affidavits for the relatively brief interval before the USFWS acts, since to do so would be in derogation of the Supreme Court's recent admonition about the extraordinary nature of the injunction remedy and its re-emphasis that courts of equity should pay particular regard for public consequences before employing such a remedy.

Animal Welfare Inst., 588 F. Supp. 2d at 109-10 (citing Winter, 555 U.S. at 24).

**D.     Weighing The Factors**

The Court finds that Plaintiffs have failed to meet their burden on this Motion For Preliminary Injunction. While Plaintiffs have shown a likelihood of success on the merits, the

likelihood of success simply does not outweigh the other factors.  See Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 12 (7th Cir. 1992) (stating that "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side.")

Plaintiffs have not made a strong showing of irreparable harm.  Instead, the experts in this case contest the harm that will befall the Atlantic salmon population should the Projects operate their turbines for this short 51-day period.  Some number of Atlantic salmon smolts will be harmed regardless of the operation of the turbines, and the increase in the number of Atlantic salmon smolts saved if the turbines cease is measured in the low percentages.  Indeed, there will only be a 1% increase in the number of Atlantic salmon smolts saved if the Brunswick Project on the Androscoggin River shutters its turbines.  What is not contested is that other factors, such as marine mortality, dictate the recovery of the species.  Further, any claim of irreparable harm by Plaintiffs and their experts is belied by the delayed filing of the pending Motion.

Finally, the Court finds that the relevant impositions and the public interest further tip the balance against a preliminary injunction.  The public, Defendants, the Atlantic salmon and the interests served by Plaintiffs Friends of Merrymeeting Bay and Environment Maine will be furthered by allowing the Projects to operate during the entirety of the spring 2013 Atlantic salmon smolt migration.  All parties and interests benefit from information that could protect this endangered species in the future.  The studies proposed by Defendants and supported by NMFS will do exactly that.  Further, that other dams on these rivers have incidental take authority and that these Projects are likely to gain the same in the near future counsels this Court against imposing a preliminary injunction.  As in Animal Welfare Institute, NMFS with its considerable agency expertise shortly will address the question of the impact of these Projects on Atlantic

22

salmon and under what conditions these Projects may operate.  See Animal Welfare Institute, 588 F. Supp. 2d at 109 (stating that "it seems unarguable that at some point, now that the ITP application has been filed, the USFWS will address the question of whether the state of Maine should be accorded an ITP for the lynx and, if so, under what conditions").  Accordingly, here the Court exercises its equitable powers narrowly and finds that the balance of factors weigh against the grant of a preliminary injunction.

## V.      CONCLUSION

For the reasons explained herein, Plaintiffs' Motion For A Preliminary Injunction And Incorporated Memorandum Of Law (ECF No. 148) is DENIED.  The Court further ORDERS that this case be placed on the next available trial list.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 30th day of April, 2013.